## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,      )
*ex rel.* PHILLIP M. ADAMS,      )
                           )

Plaintiff,      )     Case No. 15-cv-00608-TFH

                       )
v.      )

DELL COMPUTER CORPORATION, *et al.*,      )     **FILED UNDER SEAL**

Defendants.      )
                       )

## UNITED STATES OF AMERICA'S OPPOSITION TO RELATOR'S MOTION TO EXTEND SEAL REQUESTED BY THE DEPARTMENT OF JUSTICE TO INCLUDE RELATOR'S COMPLAINT AND ITS ATTACHMENTS

Pursuant to the False Claims Act (FCA), 31 U.S.C. §§ 3729-33, as amended, the United States, through its undersigned counsel, respectfully submits this Opposition to Relator's Motion to Extend Seal Requested by the Department of Justice to Include the Complaint and Its Attachments (Motion).

### I. PROCEDURAL BACKGROUND

On April 22, 2015, relator Phillip M. Adams (Relator) filed this *qui tam* action alleging that defendants Dell Computer Corporation and various other Dell entities (collectively, "Dell") manufactured and then sold to the Government computer systems that have hardware security vulnerabilities that Relator calls Hardware Trojans. Relator's Complaint generally alleges that Dell's sale of these computers to the Government, combined with Dell's failure to disclose the alleged Hardware Trojans, creates liability under the FCA. On June 25, 2015, the United States sought a three-month extension of the seal, pursuant to 31 U.S.C. § 3730(b)(3), so it could continue its investigation of the allegations. On September 23, 2015, after conducting its

investigation, the United States filed a Notice of Declination (Declination), notifying the Court that it was declining to intervene in this matter.

On September 28, 2015, Relator filed his Motion and supporting Memorandum, asking the Court to maintain indefinitely the seal on the Complaint (and exhibits) *while Relator actively litigates this matter*. Relator claims his reason for seeking to maintain the seal is "to avoid the risk that a member of the domestic or foreign public reading the Complaint and its supporting filings could discover the existence of this Hardware Trojan and how to exploit it to the detriment of the federal government and the entire country." Motion at ¶ 3.[1] However, as set forth in detail below, Relator's purported reason for wishing to maintain the seal misunderstands the purpose of the FCA's seal and does not overcome the "strong presumption in favor of public access to judicial proceedings." *EEOC v. Nat'l Children's Ctr.*, 98 F.3d 1406, 1409 (D.C. Cir.1996) (*quoting Johnson v. Greater Southeast Cmty. Hosp. Corp.*, 951 F.2d 1268, 1277 (D.C. Cir.1991)). "Because of the vital public interest in open judicial proceedings, the Government has a general overriding affirmative duty to oppose their closure," 28 C.F.R. § 50.9, and the United States here opposes Relator's Motion to maintain the seal on the Complaint and its exhibits.

---

[1] Relator also contends in paragraph 6 of his supporting Memorandum of Law that "Although the Department of Justice has had this matter under review for almost eleven (11) months, at no time did the Department of Justice ask Relator not to file the action." This statement is not correct. As he acknowledges, in December 2014, Relator made a pre-filing presentation to the United States Attorney's Office of the Eastern District of Texas (USAO-EDTX). Memorandum ¶ 5. At that meeting, the USAO-EDTX advised Relator of its assessment of the matter. Relator then sent a "written supplement" to the USAO-EDTX, *id.*, which conducted no investigation, consistent with its prior assessment of the matter. Relator sent a copy of the written supplement to the United States Attorney's Office for the District of Columbia (USAO-DC), but that letter was addressed to the USAO-EDTX. The second page of the letter consisted solely of the "cc" block to the USAO-DC, and the included supplement specifically stated it was for the USAO-EDTX. There was no context for the USAO-DC to open an investigation and it did not do so. Moreover, the Department of Justice was not served with any pre-filing disclosures or supplements and only learned of this matter when it was served with the Complaint on April 27, 2015. Therefore, the Department of Justice has only been investigating this matter for the five months from when it was served with the Complaint to when it filed its Notice of Declination.

2

## II.    LEGAL ANALYSIS AND ARGUMENT

### A.    The False Claims Act's Seal Provision Exists Solely to Protect the Government's Investigation and Does Not Contemplate Permanent Sealing.

It is well-settled law that the FCA's seal exists solely to allow the United States time to

investigate a *qui tam* relator's allegations and make a reasoned decision about whether to

intervene in and take over the case.

> Keeping the qui tam complaint under seal for the initial 60-day time period is
> intended to allow the Government an adequate opportunity to fully evaluate the
> private enforcement suit and determine both if that suit involves matters the
> Government is already investigating and whether it is in the Government's
> interest to intervene and take over the civil action. . . .

*              *              *

> The initial 60-day sealing of the allegations has the same effect as if the qui tam
> relator had brought his information to the Government and notified the
> Government of his intent to sue.  The Government would need an opportunity to
> study and evaluate the information in either situation. . . .

S. Rep. No. 99-345, 99th Cong., 2d Sess. 24, reprinted in 1986 U.S. Code Cong. & Admin. News

5266, 5289.

Notably, while the FCA contains a provision explicitly allowing the Government to

obtain extensions of the initial 60-day seal "for good cause shown," 31 U.S.C.§ 3730(b)(3), there

is no provision authorizing a relator to seek such an extension, and no provision authorizing a

permanent or even indefinite sealing of a declined case.

Indeed, "FCA cases are brought with the expectation that the pleadings will eventually be

unsealed." *United States ex rel. Durham v. Prospect Waterproofing, Inc.*, 818 F. Supp. 2d 64, 67

(D.D.C. 2011) *(citing ACLU v. Holder*, 673 F.3d 245, 257 (4th Cir. 2011) ("We agree that

'sunlight' and 'openness' are important values that further the functioning of this republic and

note that **in every FCA case, the qui tam complaint will be unsealed**.") (Emphasis added.)).

"When Relator filed his Complaint, his purpose was for his allegations to be the basis of a

3

potential trial. Therefore, there is a strong presumption for public access weighing in favor of unsealing the Complaint." *Durham*, 818 F. Supp. 2d at 69. *See also United States ex rel. Coughlin v. IBM Corp.*, 992 F. Supp. 137, 140 (S.D.N.Y. 1998) (noting that the FCA "envisions the lifting of the seal as to certain documents, particularly the relator's complaint"); *United States ex rel. Herrera v. Bon Secours Cottage House Servs.*, 665 F. Supp. 2d 782, 784-85 (E.D. Mich. 2008) ("In this Court's opinion, the imposition of a 60-day time period for sealing *qui tam* complaints reflects Congress' desire to have the seal lifted after the Government conducts its initial investigation and decides whether to intervene"). "[T]here is nothing in the FCA suggesting that the initial seal was imposed to protect the identity of the relator or that *qui tam* complaints in which the Government decides not to intervene should be permanently sealed." *Herrera*, 665 F. Supp. 2d at 785.

In this case, the United States has conducted an investigation into Relator's allegations and has declined to intervene in the matter. The FCA therefore contemplates that the Complaint should be unsealed.

## B. Relator's Arguments Do Not Overcome the "Strong Presumption in Favor of Public Access" to the Complaint.

"Cases brought under the False Claims Act receive special consideration by the courts because they 'inherently implicate the public interest.'" *United States ex rel. Grover v. Related Companies, LP*, 4 F. Supp. 3d 21, 25 (D.D.C. 2013), *quoting Durham*, 818 F. Supp. 2d at 67 (*quoting United States ex rel. Littlewood v. King Pharmaceuticals, Inc.*, 806 F. Supp. 2d 833, 840 (D. Md. 2011)). Relator somewhat cursorily argues that application of the D.C. Circuit's six *Hubbard* factors justifies continued sealing of the Complaint and its exhibits. However, in the only three reported cases where the courts have applied *Hubbard* in the FCA context, the courts have rejected the relators' arguments and instead unsealed the complaints. *United States ex rel.*

4

*Grover v. Related Companies, LP*, 4 F. Supp. 3d 21 (D.D.C. 2013) (applying *Hubbard* to unseal case, and refusing to redact parties' names); *Durham*, 818 F. Supp. 2d at 69 (applying *Hubbard* and unsealing complaint); *United States ex rel. Schweizer v. Oce, N.V.*, 577 F. Supp. 2d 169 (D.D.C. 2008) (applying *Hubbard* and unsealing the complaint and all attachments). Just as in those cases, here application of the *Hubbard* factors simply does not overcome the "strong presumption in favor of public access," *Nat'l Children's Ctr.*, 98 F.3d at 1409, and Relator's Motion should be denied.

In *Unites States v. Hubbard*, 650 F.2d 293 (D.C. Cir. 1980), the D.C. Circuit identified six factors that a court should consider when determining whether to seal court documents: (1) the need for public access to the documents at issue, (2) the extent of previous public access to the documents, (3) the fact of objection to the disclosure and the identity of the objector, (4) strength of the property and privacy interests asserted, (5) possibility of prejudice, and (6) the purposes for which the documents were introduced. *Hubbard*, 650 F.2d 293 at 317-22. Analysis of each of these factors demonstrates why the Complaint should be unsealed.

### 1. The need for public access.

In *Hubbard*, the D.C. Circuit "characterized public access to judicial records as 'fundamental to a democratic state,' in that such access 'serves the important functions of ensuring the integrity of judicial proceedings in particular and of the law enforcement process more generally.'" *Schweizer*, 577 F. Supp. 2d at 172, *quoting Hubbard*, 650 F.2d at 315 & n. 79.

Relator acknowledges that "[c]ases brought under the False Claims Act receive special consideration by the courts because they 'inherently implicate the public interest.'" Relator's Memorandum of Law in Support of Motion (Memorandum or Mem.) at ¶ 10, citing *Grover*, 4 F. Supp. 3d at 25. Without examining any other facts or considerations, Relator nonetheless

5

proclaims that the need to "guard against risks to national security interests" justifies maintaining the seal. Mem. ¶ 10, *citing Hubbard*, 650 F.2d at 315-316. Relator argues this is because of the risk of "a member of the domestic or foreign public exploiting the information on file with the court and using it to harm the federal government and the entire country by exploiting security vulnerabilities in certain computer systems in use by the government." Mem. ¶ 11. But Relator is putting the cart before the horse; he is assuming that everything he alleges in the Complaint about the hardware Trojans and their potential impact is true when he has not yet proven that (and before Dell has had an opportunity to disprove that). Such an assumption cannot give rise to a presumption against public access.

Moreover, taxpayers – *i.e.*, the public – possess a strong interest in allegations of fraud committed against the United States that results in monetary loss to the Government. "[B]ecause this case involves the FCA, the taxpaying public are, in effect, real parties in interest: the FCA exists 'to enhance the Government's ability to recover [pecuniary] losses sustained as a result of fraud.'" *Schweizer*, 577 F. Supp. 2d at 172, *quoting* S.Rep. No. 99-345, at 1 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5266. Accordingly, there is a "generalized need for public access" in FCA cases. *Schweizer*, 577 F. Supp. 2d at 173. Here, where Relator alleges a potential loss of $2 billion, Complaint ¶ 25, the taxpaying public's interest in the matter would be substantial.

Lastly, Relator's argument is inherently contradictory. Relator purports to be concerned about the potential threat to "computer systems in use by the government," Mem. ¶ 11, yet surely Dell has sold far more of the allegedly affected computer systems to the billions of people and millions of companies worldwide. Relator has also admitted to the Government that companies other than Dell have sold allegedly affected computer systems, and thus the problem Relator

6

complains of would have implications beyond the narrow confines of Relator's *qui tam* against Dell. If the affected computer systems really are the substantial threat that Relator alleges, then shouldn't the public at large be alerted so they can take protective measures? Relator ignores this public interest.

For all of these reasons, the need for public access weighs heavily in favor of disclosure.

### 2. The extent of previous public access to the documents.

"Previous access is a factor which may weigh in favor of subsequent access." *Hubbard*, 650 F. 2d at 318. Relator contends that because the "case was filed under seal and has not yet been made available to the public," Mem. at ¶ 12, that justifies its continued sealing.[2] However, the United States submits that the fact that the "case was filed under seal" actually *supports* disclosure. Stated simply, if Relator's *qui tam* Complaint remains sealed, the public will never learn of the allegations, and as discussed above, there is a recognized "strong presumption" in the law that the public has a right to know about allegations that are filed in federal court, particularly if they involve alleged misuse of federal funds. At a minimum, the existence of the seal is a neutral factor. "The public did not have prior access to the pleadings in the present case because this case was under seal pursuant to procedures provided in the FCA. *See* 31 U.S.C. § 3730(b)(2). This factor is thus neutral." *See Durham*, 818 F. Supp. 2d at 67-68.

Additionally, Relator does not acknowledge that several of the exhibits he attached to his Complaint were created from documents and information already in the public domain. Exhibits B and C, for example, each consist of a one-page chart totaling spending by the Government on various Dell computers by model. Each chart has two columns; the first column is titled

---

[2] Relator also justifies sealing of the Complaint because he claims to be the "first person to discover these Hardware Trojans and information about them is not publicly available." Mem. ¶ 12. Of course, this is a catch-22 situation; if the Complaint and allegations remain sealed, then if someone else did know about the Hardware Trojans they could not disprove Relator's claims because they would not know of this case.

"Model" in Exhibit B and "Model Line" in Exhibit C and each column simply lists various Dell computer models. The second column on both exhibits is titled "USASpending" and for each computer model in the first column, the USASpending column simply lists the corresponding amount the Government spent on purchasing such computers. The title of the column – "USASpending – references "an official website of the U.S. Government" (www.usapsending.gov) that was established specifically so that the public could learn exactly what the Government was spending money on, and from which Relator extracted information he included in the Complaint and used to create Exhibits B and C.[3] It would be incongruous to use those exhibits, culled from the usaspending.gov website, as justification for sealing the Complaint and withholding them from the public – when the information in those exhibits was taken from the public domain and put there specifically so the public could have access to it.

The inclusion of already-public information in Relator's Complaint and Exhibits thus weighs heavily in favor of unsealing.

### 3.   The fact of objection to the disclosure and the identity of the objector.

Relator argues that because he has objected to the unsealing, "this factor favors sealing." Mem. ¶ 13. Relator selectively quotes from two cases in support of this position, but neither case involved an FCA matter where the documents were sealed pursuant to the specific terms of a statute that mandated a temporary sealing so the Government can investigate the matter. In the three FCA-*Hubbard* cases, the courts divided – finding in two that because relator objected, the factor weighs in favor of maintaining the seal, *Grover*, 4 F. Supp. 3d at 26 (but still unsealing

---

[3] As the Schweizer court noted, "If Relator[] ha[s] relied on publicly available information, [he] may not be [an] "original source[]" with standing to bring this FCA action, and [defendant] could properly move to dismiss for lack of subject matter jurisdiction. Unless the exhibits are unsealed, however, [defendant] cannot evaluate this potential defense." *Schweizer*, 577 F. Supp. 2d at 172-73. The United States is not here opining as to whether Relator is or is not an original source, but is merely highlighting things the court should consider when evaluating the *Hubbard* factors.

8

complaint and refusing to redact); *Durham*, 818 F. Supp. 2d at 68 (but still unsealing complaint). The third court held that relators' objections did <u>not</u> weigh against lifting the seal. *Schweizer*[4], 577 F. Supp. 2d at 176. None of the courts addressed the fact that relators in general have a vested financial interest in pursuing FCA cases, at a minimum given the potential Relator's share of any FCA judgment. Additionally, the United States notes again with respect to this factor that the seal that Relator seeks to maintain is statutorily intended solely for the Government, and the FCA does not contemplate or provide any mechanism for Relator to seek a permanent or even temporary seal extension. This factor should thus weigh in favor of unsealing, or at least be neutral.

### 4. Strength of the property and privacy interests asserted.

Relator argues that "the public's own interest in preventing this information from falling into the wrong hands weighs in favor of keeping the Complaint and its attachments under seal." Mem. ¶ 14. Relator's argument misapplies the law. "The fourth *Hubbard* factor requires the Court to 'assess the strength of any property or privacy interests voiced by the moving party.' In *Hubbard*, the D.C. Circuit considered 'the objecting party's privacy interest in the particular documents ... rather than the effect that unsealing the documents would have on the party's property and privacy interests generally....'" *Grover*, 4 F. Supp. 3d at 26 (internal citations omitted).

Indeed, the cases analyzing this *Hubbard* factor address a specific claimed property or privacy right of an individual "in the particular documents." *See Hubbard*, 650 F.2d at 320 (Church expressing privacy interest by objecting to unsealing of documents seized from Church

---

[4] In *Schweizer*, the relators only objected – on privilege grounds – to the unsealing of their disclosure statement, which they filed with the complaint, and the exhibits to the complaint, and did not object to unsealing the complaint itself. The court found the relators waived their privilege claims by filing the documents with the complaint, and thus, their objections bore no weight under *Hubbard*. *Id.* at 176.

property); *Grover*, 4 F. Supp. 3d at 26-27 (relator's concern about harm to his "career and reputation"); *Schweizer*, 577 F. Supp. 2d at 176 (relators' attorney-client and work product privilege claims); *Durham*, 818 F.Supp.2d at 68 (relator's concerns about employer retaliation). Here, Relator does not claim he has any specific privacy or property interest in the documents; instead, he expresses only a vague interest on behalf of "the public." "This generalized interest is not sufficient to tip this factor toward Relator." *Id.* As such, this factor weighs in favor of unsealing.

### 5.    Possibility of prejudice.

Relator does not assert that he will be harmed in future litigation, and acknowledges that "therefore, this factor is neutral." Mem. ¶ 15. The United States notes, however, that it would be impossible for the Dell defendants to defend this lawsuit without breaching the seal, as third-party discovery would likely be necessary, and maintaining a permanent seal could therefore substantially prejudice the defendants.

### 6.    The purposes for which the documents were introduced.

Relator argues that the "documents have been filed to expose the fraud of the Dell Defendants on the federal government," but even after the Government investigated and declined to intervene, Relator contends the documents should nonetheless remain sealed (while Relator continues to litigate).[5] The courts disagree. "This argument, however, ignores that this factor

---

Of course, Relator could have chosen another mechanism through which to notify the Government of his concerns regarding the alleged Hardware Trojans, with no risk of public disclosure. However, because he chose to make that notification through an FCA action, he cannot now complain of the logical and expected consequence of his filing such an action.[6] At the outset of the California litigation, Adams "made clear to the California Deputy Attorneys Generals that Dr. Adams was interested in licensing his technology to as many computer companies and government agencies as possible." *Adams, et al. v. Simpton, et al.*, Case No. 01-cv-0122 (D. UT.), Complaint ¶ 29 (filed by Adams against the California Deputy Attorneys General investigating the California *qui tam* case). Adams withdrew as relator from his California *qui tam* case against Hewlett-Packard (H-P), while California while still investigating it, and then months later signed the $27.5 million consulting deal to license his patented solutions to H-P; that

10

focuses on the *purpose* of filing [relator's] pleadings and nothing further." *Durham*, 818 F. Supp. 2d at 69 (emphasis in original). "When Relator filed his Complaint, his purpose was for his allegations to be the basis of a potential trial. Therefore, there is a strong presumption for public access weighing in favor of unsealing the Complaint." *Id.* "The more relevant a pleading is to the central claims of the litigation, the stronger the presumption of unsealing the pleading becomes." *Grover*, 4 F. Supp. 3d at 28. "The documents the Relator wants to maintain sealed— the Complaint, his Motion for Voluntary Dismissal, and the Government's Consent to Voluntary Dismissal—are central to the litigation of the Relator's FCA claims." *Id.* "Accordingly, this factor weighs in favor of lifting the seal." *Id.*; *see Durham*, 818 F. Supp. 2d at 69 (same).

Analysis and application of the six *Hubbard* factors weigh strongly in favor of unsealing. The need for public access, the already-public nature of information in the Complaint and exhibits, the lack of any of Relator's personal property or privacy interests being at issue, the lack of prejudice to Relator and the likelihood of prejudice to the defendants, and the purposes for which the documents were introduced all weigh heavily in favor of unsealing, as contemplated by the FCA. Only the fact that Relator objects potentially weighs against unsealing. As such, Relator's Motion should be denied and the Complaint and exhibits should be unsealed.

---

licensing deal involved the same patents the Eastern District of Texas court believed were the reason Adams "unreasonably delayed" filing his federal FCA action. This sequence of events is described in Attachment B (Steve Lohr, *Whistleblower Changes Sides to Aid Hewlett, Once a Target*, New York Times, July 13, 2003 (available at: http://www.nytimes.com/2003/01/13/business/whistle-blower-changes-sides-to-aid-hewlett-once-a-target.html?pagewanted=all)) (describing the *qui tam* and class action lawsuits and identifying the $27.5 million as payment by H-P to Relator to avoid the "potentially cataclysmic" problem Adams publicized).

11

## C. The Court Should Be Aware of Relator's Prior Activity and Additional Facts Before Deciding Relator's Motion.

Although analysis of the *Hubbard* factors clearly justifies denying Relator's Motion and unsealing the Complaint, the United States believes the Court should be aware of several additional facts and legal history that may provide additional insight for the Court's analysis of the Motion.

First, in one of Relator's many prior *qui tam* and other lawsuits, the court found that Relator failed to comply with the requirements of the FCA. In 1997, Relator Adams filed *United States ex rel. Adams v. Toshiba Corp., et al.*, Case No. 97-cv-728 (E.D. TX.), generally alleging that Toshiba and others sold computers to the Government with defective floppy disk drive controllers. Two years later, a class action suit against Toshiba and others was filed in the same court, with essentially the same allegations Adams had made in his *qui tam* case. Adams was retained as the plaintiff-class's expert witness, and the class action suit against Toshiba settled. The Government opted-in to the class-action settlement and settled with Toshiba for just under $28.3 million. That settlement also included dismissal of the *qui tam* action, but did not resolve the relator's share issue, so the *qui tam* court awarded Adams an 18 percent share, or just over $5 million. In justifying the minimal Relator's share award, the court made several findings potentially relevant here; the full opinion and Order is attached hereto as Exhibit A.

Among other things, the court found that Relator "unreasonably delayed reporting the alleged fraud to the Government" for ten years so Relator could obtain patents that would enable him to profit off of his patented detection and solution to the floppy disk controller issue that he publicized. Exhibit A ¶ 3. The Court also found that Relator "prospered" in the amount of $59 million in consulting agreements with Compaq and Hewlett-Packard, whom Relator sued for the same issue in another *qui tam*. *State of California ex rel. Adams v. Hewlett-Packard Company,*

12

*Inc., et al.*, Case No. 98-999978 (Cal. Sup. Ct., Dec. 16, 1998).[6] Lastly, the court found that Relator "did not substantially comply with FCA disclosure requirements." Exhibit A ¶ 4.

In the instant litigation, Relator has similarly refused to fully disclose all material information requested by the Government. For example, when asked whether Relator had "a patent, or patent pending, or patent application filed or being prepared, related to the detection of the Hardware Trojans he identified in the Complaint," he responded through counsel that he would not answer the question without a protective order from the court because "[t]he filing of a patent application is confidential and is sealed until made public though publication." Relator also acknowledged that he has known about the alleged Hardware Trojans for several years but did not immediately report them, the same conduct about which the *Toshiba* court had been concerned.

## CONCLUSION

For all of the foregoing reasons, the United States respectfully submits that Relator's request to maintain the seal on his Complaint and exhibits fails to overcome the strong

---

[6] At the outset of the California litigation, Adams "made clear to the California Deputy Attorneys Generals that Dr. Adams was interested in licensing his technology to as many computer companies and government agencies as possible." *Adams, et al. v. Simpton, et al.*, Case No. 01-cv-0122 (D. UT.), Complaint ¶ 29 (filed by Adams against the California Deputy Attorneys General investigating the California *qui tam* case). Adams withdrew as relator from his California *qui tam* case against Hewlett-Packard (H-P), while California while still investigating it, and then months later signed the $27.5 million consulting deal to license his patented solutions to H-P; that licensing deal involved the same patents the Eastern District of Texas court believed were the reason Adams "unreasonably delayed" filing his federal FCA action. This sequence of events is described in Attachment B (Steve Lohr, *Whistleblower Changes Sides to Aid Hewlett, Once a Target*, New York Times, July 13, 2003 (available at: http:.//www.nytimes.com/2003/01/13/business/whistle-blower-changes-sides-to-aid-hewlett-once-a-target.html?pagewanted=all)) (describing the *qui tam* and class action lawsuits and identifying the $27.5 million as payment by H-P to Relator to avoid the "potentially cataclysmic" problem Adams publicized).

13

presumption in favor of public access to such documents. Therefore, the United States asks that

the Court deny Relator's Motion and enter the Order previously proposed by the United States.

Dated: October 13, 2015     Respectfully submitted,

             BENJAMIN C. MIZER
             Principal Deputy Assistant Attorney General

             VINCENT H. COHEN, JR.
             Acting United States Attorney

             DANIEL F. VAN HORN (D.C. Bar # 924092)
             Chief, Civil Division

             THEODORE L. RADWAY (D.C. Bar #473034)
             Assistant United States Attorney
             555 4th Street, NW – Room E4913
             Washington, DC 20530
             Tel: 202.252.7874
             Fax: 202.252.2599
             ted.radway@usdoj.gov

             MICHAEL GRANSTON
             SARA MCLEAN
             DAVID TYLER
             Attorneys, Civil Division
             Commercial Litigation Branch
             P.O. Box 261, Ben Franklin Station
             Washington, D.C. 20044
             Tel: 202.305.3988
             david.w.tyler2@usdoj.gov

14

# EXHIBIT A

*United States ex rel. Phillip M. Adams v. Toshiba Corporation, et al.*, **Case No. 1:97-cv-728**
**(E.D. Tex. 1997)**

EOD 6-11-01



FILED-CLERK
U.S. DISTRICT COURT

01 JUN -8 AM 8:34

TX EASTERN - BEAUMONT

BY B. Carter

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF TEXAS

## BEAUMONT DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| *ex rel.* PHILLIP M. ADAMS, and | § | |
| PHILLIP M. ADAMS, individually, | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL NO. 1:97CV728 (TH) |
| | § | JURY |
| TOSHIBA CORPORATION, et al., | § | |
| Defendants. | § | |

### ORDER REGARDING RELATOR'S
### APPLICATION FOR RELATOR'S SHARE

Before the Court is *Relator's Application for Relator's Share* (Doc. No. 71), and *United States' Response to Relator's Application for Relator's Share* (Doc. No. 76). Having reviewed the submissions of counsel, the applicable law and the record in this case, the Court is of the opinion that Dr. Phillip M. Adams is entitled to 18 percent of $28,293,650, or $5,092,857, as his Relator's share of the proceeds from the United States Government's settlement with Toshiba Corporation. 31 U.S.C. §3730(d)(1).

The False Claims Act ("FCA") *qui tam* provisions provide that:

If the Government proceeds with an action brought by a person under subsection (b), such person shall . . . receive at least 15 percent but not more than 25 percent of the proceeds of the action of settlement of the claim, depending upon the extent to which

1

97

the person substantially contributed to the prosecution of the action.

31 U.S.C. § 3730(b)(1).

The FCA *qui tam* provisions are designed to encourage those with knowledge of fraud against the Government to bring it to the fore. Thus, a financial incentive is provided. *See United States ex rel. John Doe v. John Doe Corp.*, 960 F.2d 318, 321 (2d Cir. 1992). However, the size of the financial incentive is tied to the nature of the fraud reported, to the relationship between the relator and the Government, and to the specific circumstances of the ensuing investigation and litigation. *See e.g., United States ex rel. DeCarlo v. Kiewit/AFC Enters, Inc.*, 937 F.Supp. 1039, 1045 (S.D. N.Y. 1996).

The parties are well aware of the facts and past proceedings in this case and the class-action settlement in *Shaw v. Toshiba America Information Systems, Inc.*, 91 F.Supp.2d 926 (E.D. Tex. 1999), so the Court need not repeat those here. As this litigation draws to a close, the Court is left with the task of awarding more money in a case that has already made millionaires over night. Looking back over the history of these proceedings, the Court is reminded of the theme found in the classic movie *The Treasure of Sierra Madre* and the line from Robert Service's poem, *The Cremation of Sam McGee*: "There are strange things done in the midnight sun By the men who moil for gold." Well, enough is enough—the frenzied fight for more and more ends now. Accordingly, the Court awards Dr. Phillip M. Adams 18 percent of $28,293,650, or $5,092,857, as his Relator's share of the proceeds from the Government's settlement with Toshiba Corporation, and enters the following findings in support thereof:

1.      The Court **FINDS** that any recommendation of Relator's share by former United States Attorney Mike Bradford, and the prior correspondence and discussions involved, were in the nature of settlement discussions. As such, this evidence is not

admissible pursuant to FED. R. EVID. 408.

2.    The Court **FINDS** that the Government received $23 million in cash and $10.5 million in coupons as proceeds from the settlement with Toshiba. As the evidence indicates, the Government liquidated these coupons at a reduced value of $5,893,650. Thus, the Government's proceeds from the settlement with Toshiba amounted to $28, 893,650. Accordingly, when applied to the correct proceeds amount, Relator's share totals 18 percent of $28,293,650, or $5,092,857.

3.    The Court **FINDS** that Relator unreasonably delayed reporting the alleged fraud to the Government. As noted, this case was filed on December 31, 1997. The evidence suggests Relator knew of the alleged defect in the floppy-diskette controller as early as 1987. Regardless, the Court is aware of Relator's patent application for "Systems and Methods for FDC Error Detection and Prevention" filed in 1992—almost five years prior to filing this lawsuit. In addition, Relator filed a second patent application titled "Defective Floppy Disk Controller Detection Apparatus and Method" in 1996. The available evidence supports a finding that Relator delayed his reporting of the fraud to the Government.

4.    The Court **FINDS** that Relator did not substantially comply with FCA disclosure requirements. The FCA requires a relator to serve upon the Government a copy of the complaint and "written disclosure of substantially all material evidence and information" in relator's possession. 31 U.S.C. §3730(b)(2). Although Relator disclosed specific Toshiba products that he tested to be defective, he did not provide the Government with complete testing results as to all defendants. Relator's failure to substantially comply with FCA disclosure requirements warrants the Court's award of 18 percent of $28,293,650, or $5,092,857, as Relator's share of the Government's proceeds from the Toshiba settlement.

5.    The Court **FINDS** that Relator has not suffered adverse consequences from his disclosure as alleged. To the contrary, Relator has prospered as a result of the Toshiba settlement and subsequent case filings. Following the Toshiba settlement in *Shaw*, class counsel filed additional lawsuits against five, prominent computer manufacturers, including Hewlett-Packard (H-P) and Compaq Computer Corporation. The evidence shows that Relator entered into consulting agreements with both H-P and Compaq for a total sum of $59 million. Although Relator may have been terminated from his job at Novell and "blackballed" by the computer industry as a result of his disclosure, the financial impact from Relator's actions has been anything but adverse.

**IT IS THEREFORE ORDERED** that the Relator, Dr. Phillip M. Adams, is entitled to 18 percent of $28,293,650, or $5,092,857, as his Relator's share of the proceeds from the United States' settlement with Toshiba Corporation. 31 U.S.C. §3730(d)(1).

3

**IT IS FURTHER ORDERED** that the United States Government shall pay Relator, Dr. Phillip M. Adams, his Relator's 18 percent of $28,293,650, or $5,092,857, no later than sixty (60) days from the date the Court's Order is entered.

**SO ORDERED.**

Signed this 8th day of June, 2001.

Thad Heartfield
United States District Judge

4

# EXHIBIT B

**Steve Lohr, "Whistle-Blower Changes Sides to Aid Hewlett, Once a Target,"** *New York Times*, **January 13, 2003**



**The New York Times**

This copy is for your personal, noncommercial use only. You can order presentation-ready copies for distribution to your colleagues, clients or customers, please click here or use the "Reprints" tool that appears next to any article. Visit www.nytreprints.com for samples and additional information. Order a reprint of this article now. »



January 13, 2003

# Whistle-Blower Changes Sides To Aid Hewlett, Once a Target

By STEVE LOHR

Personal computer makers shuddered in 1999 when Toshiba agreed to a $2.1 billion settlement in a class-action suit for shipping computers with an arcane flaw. The mammoth settlement opened the door to potentially lucrative follow-on suits against other PC makers, and the first companies in the sights of the Texas class-action lawyers behind the Toshiba case were Compaq and Hewlett-Packard.

Yet the settlement was also a sweet triumph for Phillip M. Adams, a former I.B.M. engineer who had been on a personal crusade for more than a decade to bring the problem to light and force PC makers to fix it. Mr. Adams was the principal expert witness for the class-action lawyers.

Today, the class-action suits continue against Hewlett-Packard. which acquired Compaq last year, before a Texas state court. But Mr. Adams is no longer working for the plaintiffs. Instead, he is working with Hewlett-Packard, having sold the company a software patch for the computer flaw and agreed to assist Hewlett-Packard in its defense.

For his technology and his cooperation, Mr. Adams signed a contract for a total of $27.5 million with Hewlett-Packard in May 2000 -- one of a pile of documents unsealed within the last two weeks by a California state court in San Francisco. Those documents, in a related case involving the state of California and Hewlett-Packard, show that Mr. Adams also collected more than $4.5 million as a result of filing a whistle-blower suit on behalf of California in the state's $30 million settlement with Toshiba. He also got $5 million as his share of a $33.5 million settlement of a similar suit against Toshiba on behalf of the federal government.

The California state attorney general's office took a dim view of the Hewlett-Packard deal with Mr. Adams, accusing both of "a lack of candor and deception" in court papers. The Texas class-action lawyers say they feel jilted by Mr. Adams, but they reserve their real scorn for Hewlett-Packard, which they are suing.

"I don't think Phillip Adams is a bad guy," said L. DeWayne Layfield, a class-action lawyer in Beaumont, Tex. "He started out as a very studious person, almost an academic, who wanted to solve this problem. He had an idea, H.-P. put a lot of money on the table, and he went for it."

Hewlett-Packard said in a statement that "the company acted entirely ethically and in the best interests of consumers" by making a deal with Mr. Adams for his software and his services.

Mr. Adams, through a lawyer, declined to be interviewed. But in the California litigation, a brief filed by Mr. Adams's lawyers portrayed him as acting in the public interest by trying to license his valuable technology to companies that wanted to fix a problem. The brief accused the state of California of hypocrisy and said it had tried to steal his technology and had violated Mr. Adams's First Amendment rights by seeking to prevent him from talking to PC makers and selling his software.

Views of Mr. Adams's actions vary widely. But as Michael W. Lockhart, a federal prosecutor in Texas who has investigated the claims that defective computers were sold to government agencies, observed, "Phillip Adams is a brilliant guy, and he did a great job of creating a market for his product."

In the late 1980's, Mr. Adams worked on an engineering team at I.B.M. that discovered a bug in specialized chips that shuttle data onto a PC's floppy disks. The chips -- called floppy-disk controllers -- would sometimes randomly delete or alter data being transferred to a floppy-disk drive. The problem is real, but just how widespread or serious it is in practice is a matter of debate.

"Every once in a while, data is corrupted," said Edmond S. Cooley, an assistant professor of engineering at Dartmouth College, who has recently studied the disk-controller problem for the class-action lawyers.

The problem is not only random, Mr. Cooley says, but it also does not generate an error message to alert the user of trouble. Still, if the user checks and notices a problem, the matter is generally resolved by copying the file again. "You try again, rewrite the document and that usually fixes it," he said.

Other computer experts question how much vital corporate or government information is kept anymore on three-and-a-half-inch floppy disks, which were once standard. Crucial data, they say, is now typically backed up and stored on corporate and government computer networks instead of on fragile disks. Indeed, Apple Computer thinks so little of floppy disks that it no longer includes floppy-disk drives on its machines.

But in some cases, Mr. Cooley says, the disk-controller problem has the potential to be a serious matter -- for example, if soldiers or doctors working with notebook computers in the field have military or medical data corrupted.

Mr. Adams, it seems, has no doubts about the gravity of the issue he has championed. In written testimony in the California litigation in 2001, Mr. Adams said the random fouling of data in computers was "an enormous problem, and is potentially cataclysmic." He added, "For example, if data in Department of Defense computers pinpointing enemy targets is corrupted,

and the weapons aimed at those targets badly miss the targets, the targets will not be hit and innocent civilians will be killed."

Mr. Adams went on to say that a shutdown of the air-traffic control system in the Western United States in October 2000 was "most likely the result of a defective floppy disk drive in F.A.A. computers," referring to the Federal Aviation Administration.

PC makers have consistently said they have received few, if any, customer complaints about data corruption on floppy disks. After the Toshiba settlement in 1999, PC makers scrambled to investigate the problem. A lawyer for one PC maker characterized the disk-controller problem as "mainly theoretical" and said it tended to surface mainly when a notebook computer was in conditions of extreme heat and being jostled around.

Indeed, in its May 2000 agreement with Mr. Adams, Hewlett-Packard did not concede that the floppy-disk-controller flaw -- termed the F.D.C. error in most legal documents -- exists, except in theory. "To the contrary," the contract states, "it is expressly understood that HP does not admit or concede that the F.D.C. Error can occur in a natural (as opposed to theoretical or artificial) environment. This agreement is made by HP for the purpose, among others, of supporting its consumers."

This puts Hewlett-Packard in the somewhat curious position of agreeing to pay $27.5 million to Mr. Adams for his software and his advisory services to deal with a problem that the company does not acknowledge is a real problem.

If it avoids a settlement in the range of the $2.1 billion paid by Toshiba, the agreement with Mr. Adams could be seen as comparatively inexpensive for Hewlett-Packard. Still, the $27.5 million was more than seven times the $3.7 million in salary, bonus and other compensation paid to the company's chief executive, Carleton S. Fiorina, that year.

Mr. Adams, to be sure, profited handsomely from his chip-flaw crusade. But so did others. Four class-action law firms pocketed $147.5 million as their cut of the Toshiba settlement. Of the rest of the settlement, about $600 million in cash went to class members, ranging from large companies to individuals, and they also received hundreds of millions of dollars' worth of coupons redeemable for Toshiba products. About $350 million was given to a charity dedicated to equipping schools in lower-income neighborhoods with computers.

With Mr. Adams filing whistle-blower suits on their behalf, the federal government and the state of California also collected millions in the Toshiba case.

California's litigation against Hewlett-Packard and Mr. Adams has been resolved, but its false-claims investigation against Hewlett-Packard is continuing. One of the company's outside law firms has been removed from the state's false-claims investigation, and Hewlett may not talk to Mr. Adams about the California false-claims case.

Christopher Ames, California's senior assistant attorney general, said in a statement that the separate litigation had been taken "to deter whistle-blowers who might try to bring actions on behalf of the state, then collude with the defendants and thus undermine false claims prosecutions." The outcome, he added, should "assist in accomplishing that objective."

In Texas, the class-action suit against Compaq, which is now part of Hewlett-Packard, is furthest along. The suit contends that Compaq knowingly shipped 1.8 million PC's with the disk-controller flaw. A state trial court in Jefferson County, a hotbed of class-action litigation, certified the plaintiffs as representing a national class of Compaq customers, a step that raises the stakes for Hewlett-Packard. Compaq's lawyers have appealed to the Texas Supreme Court.

After the litigation began, Hewlett-Packard and Compaq made sure that the controller chips no longer had the flaw, class-action lawyers say. To fix older machines, both companies in 2000 made a software patch available to users on their Web sites. The unsealed court records show that Compaq also talked to Mr. Adams and may have reached an agreement with him, but a lawyer for Hewlett-Packard said the patch on the Compaq Web site was not Mr. Adams's software.

As for Mr. Adams, not much is known for sure. He is about 50 years old, heavyset and secretive, people who have met him say. They say he lives in Utah, is a Mormon and frequently does missionary work in Vietnam and elsewhere. He holds doctorates in applied computer science and engineering and is an independent consultant. "Last I heard, he was in Australia last year, doing some work for the government there, I think," said Mr. Layfield, the class-action lawyer.

Searches of several common databases showed no address or phone number for Phillip M. Adams in Utah. "He does enjoy his privacy," said his lawyer, who asked not to be identified.

Copyright 2015 The New York Times Company | Home | Privacy Policy | Search | Corrections | XML | Help | Contact Us | Back to Top

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of October 2015, I caused to be placed in the United

States mail, postage prepaid first class, a true and correct copy of the foregoing, United States of

America's Opposition to Relator's Motion to Extend Seal Requested by the Department of

Justice to Include Relator's Complaint and Its Attachments, to:

L. DeWayne Layfield, Esq.
Law Office of L. DeWayne Layfield
P.O. Box 3829
Beaumont, TX 77704-3829

James E. Sharp, Esq.
Stephen W. Grafman, Esq.
SHARP & ASSOCIATES, PLLC
1215 19th Street, N.W.
Washington, D.C. 20036

Theodore L. Radway
Assistant United States Attorney